McKinney, J.,
delivered the opinion of the Court.
This bill was brought to have a gaming security delivered up and cancelled. The bill ivas dismissed on demurrer.
The case made in1 the bill is briefly this: In the summer of 1858, the complainant, who is a resident of Louisiana, made a visit to Hardin Springs, in this State, for the benefit of his health, which was then bad.
On his arrival at the Springs, his condition was such as to require the aid of a physician. The defendant, Hr. Creighton, a physician of Memphis, who was at the Springs, was called in. After some days, complainant’s health began to improve; and his physician advised him that exercise at rolling ten-pins, and the use of cham-paigne wine as a tonic, would be of benefit to his *619 health. Accordingly, a game .was made up, at which it was arranged that complainant and his professed friend and physician, Dr. Creighton, should play against the defendants, Wynne and Worsham. They at first played for wine; hut after complainant had become much excited by the free use of wine, it was proposed to play for money, at twenty dollars a game; this was assented to, and the playing and drinking were continued until it was announced that complainant and his partner, Creighton, had lost one thousand dollars; five hundred of which, complainant was told, he must pay to defendant. Wynne. Complainant while incapable, from his condition, of attending to business, was induced to sign a draft, written by Wynne, for $500.00, on the defendants, Webb & Ruffin, of Memphis. After the draft was given to Wynne, Creighton pretended that he was compelled to return to Memphis, and abandoned complainant, though urged to continue his attentions as a physician.
Wynne, on reaching Memphis, presented the draft to Webb & Ruffin, and procured their check on a bank in Memphis for the amount. But, before the check was paid, complainant learned that the advice of his physician, to exercise at ten-pins and drink wine, was part of a meditated scheme between him and his confederates, Wynne & Worsham, to ensnare complainant and swindle him out of his money; and that in playing, Creighton colluded with Wynne and Worsham, so as always to make them win the game. Upon being satisfied of this fact, complainant sent a dispatch to Webb & Ruffin, directing them not to pay said draft; on the reception of which they notified the bank to withhold payment of their check, and payment was accordingly *620 refused. Wynne, thereupon, had the check protested, and commenced suit upon the same.
To enjoin this suit, and to have said check surrendered up and cancelled, is the object of the bill.
The jurisdiction of a Court of Equity to grant this relief is denied, on the authority of the case of Weakly v. Watkins & Ferguson, 7 Hum., 356. That case, it is apparent, was hastily considered; and there is no reference to any authority in support of the decision. It is in direct opposition to the case of Johnson v. Cooper & Crosswhite, 2 Yer., 524, in which, upon an elaborate examination of the question on principle and authority, the contrary doctrine was established.
The case of Weakley v. Watkins, might well enough be distinguished from the present case, by the element of a most atrocious fraud which characterizes the latter.
We are not inclined, however, to rest our determination upon this distinction, but upon the distinct principle announced in Johnson v. Cooper Crosswhite, which, in our opinion, is the sound doctrine, and well sustained by authority.
The act of 1789, ch. 8, sec. 1, declares, that every promise, agreement, bill, bond, or other contract, to pay, deliver, or secure money or other thing, won or obtained by any species of gaming; likewise, every sale, conveyance or transfer of land, slaves or other personal property, shall be void. And by the 4th sec., a remedy is provided for the recovery, within a limited time, of any money or other valuable thing, so lost and paid or delivered, in any Court of Record having cognizance thereof.
This statute makes all gaming contracts, and all *621 gaming securities, absolutely void, at law as well as in equity; and it provides a new remedy in the legal forum, for the recovery of “ money or goods ” lost at gaming, and paid or delivered. This limited remedy at law is not adequate in all cases. It is not adapted to-the relief necessary in some instances, nor to the carrying into full effect tire great public policy intended to-be established by the Legislature. It was not designed,, nor can it be construed, to interfere with the previously well established jurisdiction of Courts of Equity on this subject. And at the date of the passage of the act, perhaps no head of equity jurisdiction was better established than that of compelling gaming securities to bo delivered up and cancelled. -
This is, perhaps, sufficiently demonstrated by Judge Whyte, in his elaborate opinion in Johnson v. Cooper & Crosswhite. In that case, Johnson conveyed to Crockett, a tract of land, lost by the former at a game of cards, and the latter sold and conveyed the land to Crosswhite, who was found to have had knowledge of the illegal consideration of the deed to Crockett; and the Court decreed the deed to be delivered up and cancelled.
The Court held, that, in view of the public policy of the law to suppress all manner of gaming, the complainant would not be repelled merely on the ground that he was a partioeps criminis. The Court said, in the language of Lord Hardwick, that in cases of violations of public policy, it is indifferent who stands before the Court, because the Court does not regard the state and condition of the parties so much as the nature of the contract and the public good. 2 Hov. Sup,, 122. *622 The Court likewise adopted the language and sentiment of Lord Thurlow, in Neville v. Wilkinson, (18, ves. 382,) that if courts of justice mean to prevent the perpetration of crimes, it must he, not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before. Numerous cases, of the highest authority, are cited by Judge Whyte, to the effect, that, in transactions contravening public policy, relief may be given in equity to a particeps eriminis; but the relief is given always in aid, not in subversion of the public policy. The Court interferes for the sake, not of the party, but of the public. See cases referred to.
This doctrine oí the jurisdiction of a Court of Equity to declare gaming securities void, and to order them to be given up and cancelled, is sustained by numerous other authorities. Mr. Story (1 Eq. Juris, § 303) regards the principle as not to be doubted, that a bill in equity may be maintained to have any gaming security delivered up and cancelled. And, furthermore, that money paid upon a gaming contract may be recovered back, in furtherance of a great public policy, independently of any statutable provision.
In the ease of Partarlington v. Saulby, (3 Mylne & Keene, 104; 8 Cond. Eng. Ch. Rep, 298,) the complainant had accepted a bill of exchange for ¿£1000, for money lent by him at gaming, payable to one Aldridge, by whom it was indorsed to Brook, and by him to the defendant; and the bill was brought to restrain the defendants from suing thereon, in Ireland. The Lord Chancellor refused to dissolve the injunction, on the *623 ground that the consideration of the bill was not denied to be illegal, _and the circumstances leading to the belief that the defendants took the bill with knowledge of the facts as to the consideration. The only point of doubt in the mind of the Chancellor, arose out of the fact that the suit had been brought, and was pending in a court of law, in Ireland; and this was obviated on the ground that the person of the party, on whom the injunction was served, was within the jurisdiction and power of the Chancellor.
So in Winne v. Callander, (1 Russell’s Ch. Rep., 293,) the complainant accepted bills of exchange for money lost at gaming. Several of these bills were not pa’d when due, and other bills were substituted in their stead. Afterwards the complainant went to reside in France, and in the latter country accepted other bills of exchange, on French stamps, to the amount of the principal and interest due on the unpaid bills, and delivered them in lieu of the bills which the parties held before, which were given in England. And 'the Master of the Rolls held, that the consideration of the first bills being a debt contracted by gambling in England, and the French bills substituted for. them being founded on the same consideration for which the original securities were given, the complainant was entitled to have the French bills delivered up and cancelled, notwithstanding the objection that he was partieeps criminis.
Authorities might be multiplied to the same effect, but we deem it unnecessary.
We concur in the view, that the only effectual method of discouraging gaming, and carrying out the policy of the law, is to remove the temptation, by denying to the *624 offender the profits of his violation of the law. The contrary principle is rather an encouragement to the commission of the offence.
Decree reversed, and demurrer disallowed, with costs.